**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISON**

| | | |
|---|---|---|
| DANIEL BOVA and JEREMY HARRIS, | ) | |
| individually and on behalf of all others | ) | |
| similarly situated, | ) | Case No. 1:22-cv-04506 |
| | ) | |
| | ) | Judge Franklin U. Valderrama |
| Plaintiffs, | ) | |
| | ) | Magistrate Judge Beth W. Jantz |
| v. | ) | |
| | ) | Jury Trial Demanded |
| PAYLOCITY HOLDING | ) | |
| CORPORATION, a Delaware corporation, | ) | |
| and PAYLOCITY CORPORATION, an | ) | |
| Illinois corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>AMENDED COMPLAINT – CLASS ACTION</u>

Plaintiffs, DANIEL BOVA ("Dan") and JEREMY HARRIS ("Jeremy"), individually and on behalf of all others similarly situated, by and through their attorneys, Margherita M. Albarello and Brittany N. Bermudez, bring this case against Defendants, PAYLOCITY HOLDING CORPORATION ("Paylocity Holding"), and PAYLOCITY CORPORATION ("Paylocity") (collectively, "Defendants"), for a declaratory judgment that certain restrictive covenants and forfeiture and repayment clauses in the Paylocity Holding Corporation Restricted Stock Units Agreement (For U.S. Participants) are unenforceable as a matter of law and that Defendants have breached their contractual and wage and hour obligations to the individual plaintiffs and to all others similarly situated (the "putative RSU Class"). Dan and Jeremy also bring individual claims for breach of contract. Plaintiffs hereby allege against the Defendants the following causes of action and state as follows:

## **NATURE OF ACTION**

RSU Class Action

1.      This is a class action on behalf of all persons who are parties to a Paylocity Holding Corporation Restricted Stock Units Agreement (For U.S. Participants) (the "RSU Agreement") or RSU Agreement No. 2 (defined below) and (a) whose unvested Restricted Stock Units ("RSU" or "RSUs") were forfeited due to termination of employment with Paylocity, or (b) who, because of their actual or alleged breach of a covenant not to solicit or hire or a covenant not to compete, were (i) required to deliver to Paylocity Holding all RSUs granted to them in the three (3) years preceding the breach, or (ii) were required to repay Paylocity Holding the gross proceeds from dispositions of any RSUs or shares of Stock issued in settlement of such RSUs, or (iii) were required to forfeit any unvested RSUs.

2.      The Paylocity Holding 2014 Equity Incentive Plan (the "Plan") applicable to the RSU Agreement and applicable to RSU Agreement No. 2 does not provide that Participants (i) must deliver to Paylocity Holding all RSUs granted to them in the three (3) years preceding a covenant breach, or (ii) must repay Paylocity Holding the gross proceeds from dispositions of any RSUs or shares of Stock issued in settlement of such RSUs in the three (3) years preceding the covenant breach, or (iii) forfeit any unvested RSUs in the three (3) years preceding the covenant breach. A copy of the 2014 Plan is attached hereto and made a part hereof as **Exhibit A**.

3.      The RSU Agreement contains an illegal forfeiture clause (Section 5.1) providing that if the Participant's employment is terminated for any reason, his unvested RSUs are forfeited and he shall not be entitled to any payment therefor.  The clause is unenforceable as a matter of law because it disgorges wages earned by the Participant for services previously rendered to

2

Paylocity Corporation. A copy of the RSU Agreement is attached hereto and made a part hereof as **Exhibit B**.

4.      The RSU Agreement does not provide that a Participant (i) must deliver to Paylocity Holding all RSUs granted to him in the three (3) years preceding the covenant breach, or (ii) must repay Paylocity Holding the gross proceeds from dispositions of any RSUs or shares of Stock issued in settlement of such RSUs in the three (3) years preceding the covenant breach, or (iii) forfeit any unvested RSUs in the three (3) years preceding the covenant breach. (*See* **Exhibit B**)

5.      The RSU Agreement does not contain a confidentiality covenant, a customer non-solicitation covenant, an employee non-solicitation covenant, or a non-competition covenant.

6.      Nonetheless, Paylocity Holding has demanded that Dan and Jeremy repay the gross proceeds from the dispositions of all RSUs granted to each of them in the three (3) years preceding 2022 – because of their alleged breach of a non-competition covenant in a "Paylocity Holding Corporation Restricted Stock Units Agreement (For U.S. Participants)" ("RSU Agreement No. 2"). A copy of "RSU Agreement No. 2" is attached hereto and made a part hereof as **Exhibit C**.

7.      Dan signed RSU Agreement No. 2 on or about August 30, 2021.

8.      Jeremy signed RSU Agreement No. 2 on or about September 1, 2021.

9.      Assuming, *arguendo*, that RSU Agreement No. 2 is applicable, the forfeiture and repayment provisions of RSU Agreement No. 2 are unenforceable as a matter of law for each of following independent reasons: (a) Section 5.1 of RSU Agreement No. 2, like Section 5.1 of the RSU Agreement, disgorges wages earned by the Participant for services previously rendered to Paylocity Corporation; (b) Section 7.5 of RSU Agreement No. 2 (i) disgorges wages earned by the Participant for services previously rendered to Paylocity and (ii) is an unenforceable penalty

clause; (c) the confidentiality covenant (Section 7.1(a)) is overly broad and unenforceable as a matter of law; (d) the customer non-solicitation covenant (Section 7.2(a)) is overly broad and unenforceable as a matter of law; and (e) the covenant not to compete (Section 7.3) is overly broad and unenforceable as a matter of law.

10.    At least 500 Paylocity employees are governed by either the RSU Agreement or RSU Agreement No. 2.

11.    Accordingly, this Amended Complaint seeks an order: (a) declaring that the forfeiture provision in Section 5.1 of the RSU Agreement is unenforceable as a matter of law; (b) declaring that the forfeiture provision in Section 5.1 of RSU Agreement No. 2 is unenforceable as a matter of law; (c) declaring that the repayment and forfeiture provisions in Section 7.5 of RSU Agreement No. 2 are unenforceable as a matter of law; (d) declaring that the confidentiality, customer non-solicitation, and non-competitions covenants in RSU Agreement No 2 are unenforceable as a matter of law; (e) requiring Defendants to cease the unlawful activities discussed herein; and (f) awarding damages to Dan, Jeremy, and the putative RSU Class.

Breach of Contract Action

12.    This Amended Complaint also is brought on behalf of Dan and Jeremy for Paylocity Holding's breach of contract.  Assuming, *arguendo*, RSU Agreement No. 2 is applicable, Paylocity Holding has breached the agreement by demanding that Dan and Jeremy repay Paylocity Holding the *gross proceeds* from dispositions of RSUs or shares of Stock issued in settlement of such RSUs due to their alleged violation of the non-competition covenant in the agreement. In fact, Paylocity Holding knows that neither Dan nor Jeremy breached the non-competition in RSU Agreement No. 2.  Under Illinois law, every contract has an implied covenant of good faith and fair dealing. The

4

implied covenant of good faith and fair dealing requires that a contracting party vested with discretion exercise its discretion reasonably. Paylocity Holding has breached the implied covenant of good faith and fair dealing owing Dan and Jeremy by exercising the repayment provision in Section 7.5 of RSU Agreement No. 2 unreasonably and without proper motive. .

## Parties

13.     Plaintiff Dan is a resident of Tampa, State of Florida.

14.     Plaintiff Jeremy is a resident of Santa Rosa Beach, State of Florida.

15.     Defendant Paylocity Holding is a Delaware corporation with its principal executive offices located in Schaumburg, State of Illinois.

16.     Defendant Paylocity is an Illinois corporation headquartered in Schaumburg, State of Illinois. Paylocity is a subsidiary of Paylocity Holding.

## Jurisdiction

17.     Count I of the Amended Complaint is for declaratory judgment and is brought by Dan and Jeremy individually and on behalf of all others similarly situated pursuant to 735 ILCS 5/2-701.

18.     Count II of the Amended Complaint is for breach of contract.

## Facts Specific to Dan and Jeremy

19.     Paylocity is a provider of human resource management and payroll software solutions for certain-sized organizations measured by the organization's number of employees.

20.     Paylocity markets and sells its products and services primarily through its direct sales force, known as Account Executives.

21.     Paylocity has defined "market segments." During at least three (3) years prior to Dan's and Jeremy's termination of employment with Paylocity, Paylocity defined its market

segments as follows: (1) "Emerging" – under 35 employees; (2) "Majors" – from 35 to 499 employees; and (3) "Enterprise" – 500 plus employees.

22.     During the three (3) years prior to Dan's and Jeremy's termination of employment with Paylocity, Paylocity assigned Jeremy's and Dan's responsibilities, and those of its sales force, first by market segment and then by zip code.

23.     Per its published documents as a publicly-traded company, Paylocity's sales cycle can begin in a variety of ways, including, for example, a sales lead generated by the sales representative; through Paylocity's third-party referral network such as 401(k) advisors, benefits administrators, insurance brokers, third-party administrators and human resource representatives; a client referral; and Paylocity's telemarketing team, external website, or e-mail marketing.

24.     Paylocity requires its direct sales force to achieve productivity quotas.

**Dan's employment with Paylocity from January 23, 2012 to approximately December 31, 2021**

25.     Dan began employment with Paylocity on or about January 23, 2012, in the role of Senior District Sales Manager.

26.     Dan resided in the State of Florida during the entirety of his employment with Paylocity.

27.     Dan worked for Paylocity in a direct sales position until his employment ended. During the three (3) years preceding his termination of employment with Paylocity, Dan was assigned to the "Majors" market segment and, within the "Majors" market segment, Dan was assigned to particular zip codes within the State of Florida.

28.     At no time during Dan's employment with Paylocity was he ever assigned to, or responsible for, the entirety of Tampa, Florida or the "greater Tampa Area." Again, this is because

6

Paylocity assigns its Account Executives by market segment and the by zip code, not by states, cities, or counties.

29.     Dan did not work with, and Dan did not develop, business referral partners outside of his assigned market segment and assigned zip codes.

30.     In fact, Paylocity's sales policy precluded Dan from having referral sources outside of his assigned zip codes.

31.     Throughout his employment with Paylocity, Dan performed work for Paylocity within the State of Illinois. By way of example, at all relevant times, Dan worked for Paylocity in Illinois participating in multiple weeks of training, week-long Sales Kickoff events, and guest training events.

**Paylocity constructively discharges Dan**

32.     As an Account Executive, Paylocity required Dan to achieve production quotas.

33.     In or around February 2021, Paylocity increased Dan's production quota while at the same time decreasing his zip code territory and to whom he could sell product in his zip code territory.

34.     As a result, Paylocity made it near impossible for Dan to reach the production quota set by Paylocity. Paylocity's manipulation of Dan's production quota and zip code territory and Paylocity's market segmentation also negatively impacted Dan's ability to achieve his production quota and to earn a bonus related to his production quota.

35.     Moreover, Paylocity treated Dan in a discriminatory manner as compared to other Account Executives. For example, (a) Dan's FY 2021 production quota was $1,100,000.00; in contrast, the average Account Executive's FY 2021 production quota was $325,000.00; (b)

Paylocity increased Dan's FY 2022 production quota to $1,575,306; in contrast, the average Account Executive's FY 2022 production quota was $383,000.00.

36.     As a result of Paylocity's reduction of Dan's territory, its market segmentation, and its onerous and discriminatory raising of Dan's production quotas, Dan's mental and physical health deteriorated.

37.     Dan complained to Paylocity about its discriminatory treatment of him, told Paylocity about his deteriorating mental and physical health, and asked Paylocity for an accommodation. On or about September 28, 2021, Dan contacted Paylocity Chief Operating Officer, Michael Haske, to ask for additional support to assist with the production quota Paylocity set for Dan.  Dan told Haske and Paylocity Vice President of Sales, Josh Scutt, that Dan's doctor said if he continued to operate under his present stress level he was in serious risk of a heart attack or stroke.  Dan was put in contact with Leadership within the Implementation Department, and Dan emailed Haske and Scutt the results of the call.  About four (4) weeks later, Haske told Dan that his accommodation request was reasonable, but that it was not "an option" at the time.

38.      As a result of Paylocity's actions and inactions as described above, Dan was forced to resign from his employment effective December 31, 2021.

39.     Paylocity constructively discharged Dan as a result of its actions and inactions.

40.     After Paylocity received Dan's December 2021 resignation letter, Paylocity asked Dan to take an "extended FMLA."

41.     While refusing to accommodate Dan, Paylocity had no qualms about hiring his replacement, Don Johnson, at an unheard of, exorbitant compensation package, and even though Johnson had no comparable experience.  Nonetheless, Paylocity hired Johnson at a base salary of

$110,000.00 per year, provided him with a six (6) month guaranteed draw, gave him a $15,000.00 signing bonus, and gave him $40,000.00 in RSUs.

**Jeremy's employment with Paylocity from June 13, 2012 to December 10, 2021**

42.     On or about June 13, 2012, Jeremy became employed by Paylocity as a District Sales Manager. At this time, Jeremy resided in the State of Mississippi.

43.     On or about June 1, 2015, Jeremy became Paylocity Director of Sales with responsibility for various market segments and zip codes in Arkansas, Kentucky, and Tennessee.

44.     On or about January 1, 2017, Jeremy moved to and resided in the State of Tennessee.

45.     On or about January 1, 2018, Jeremy became Paylocity Regional Vice President of Sales, reporting to Vice President of Sales Hampton Crump, with responsibility for the "Majors" segment limited to certain zip codes in:

> Chicago, Illinois
> Phoenix, Arizona
> Hartford, Connecticut
> Miami/Orlando/Tampa/West Palm, Florida
> Atlanta, Georgia
> Louisville/Lexington Kentucky
> Boston, Massachusetts
> Nashville, Tennessee

46.     In his role as Regional Vice President of Sales, Jeremy managed eight (8) Directors of Sales.  Account Executives, in turn, reported to the Directors of Sales.

47.     None of the Account Executives who reported to Directors of Sales under Jeremy was assigned to the Florida Panhandle.

48.     At no time in the twenty-four (24) months preceding his December 10, 2021 termination of employment was Jeremy responsible for a part of the Florida Panhandle.

49.     Paylocity's headcount reports, which reports have at all times within the possession and control of Paylocity, show that at no time in the twenty-four (24) months preceding his December 10, 2021 termination of employment was Jeremy responsible for a part of the Florida Panhandle.

50.     In his role as Regional Vice President of Sales, Jeremy had extremely limited exposure to Paylocity clients, client prospects, and client referral sources, and, indeed, had no exposure at all to certain clients, client prospects, and client referral sources.

**Paylocity constructively discharges Jeremy**

51.     Beginning in or about November 2020, and until his employment with Paylocity ended on December 10, 2021, Jeremy resided in the State of Florida.

52.     In March 2021, Jeremy began reporting to Area Vice President, Chris Stratton.

53.     On or around June 2021, Stratton told Jeremy his production quota was increasing by eighteen percent (18%) for FY 2022 and he was losing sales teams.  This left Jeremy with the highest production quota in the United States.  Paylocity's manipulation of Jeremy's production quota and zip code territory and its market segmentation also negatively impacted Jeremy's bonus. Stratton stated to Jeremy that he had no "route" to hitting his new production quota.

54.     Paylocity was pushing Jeremy out of the company by making his production quota unattainable and his life unbearable.  For example, Paylocity's actions and inactions caused Jeremy emotional and physical distress, requiring him to receive mental health counseling and begin taking anti-anxiety medication. Stratton knew Jeremy's production quota was unattainable because he and Jeremy had covered parts of the Atlanta, Georgia market at different times. They had the same managers and the same headcounts.  When Stratton took over these parts of the Atlanta market from Jeremy in FY 2020, the production quota went down. Stratton had parts of the Atlanta

market again in FY 2021 and the quota still was lower than when Jeremy had parts of market in FY 2019. In FY 2021, the market was reassigned to Jeremy and the quota was nearly doubled from the final year that Stratton covered that market. In fact, Stratton admitted to Jeremy that his FY 2022 production quota was unattainable. Also, Scutt told Jeremy that Scutt was pushing Jeremy out of Paylocity because Stratton would not be able to get along with anyone like Jeremy because Jeremy had ideas and Stratton just wanted people who followed orders.

55.     On or about July 1, 2021, Paylocity directed Jeremy to oversee Paylocity's planned acquisition of Blue Marble Payroll. This role was a demotion without just cause. The role severely and substantially decreased Jeremy's stature at Paylocity, the number of employees he oversaw, his compensation opportunities, and his opportunities for advancement. Jeremy declined the position for these reasons. In response, Scutt told Jeremy that he had no other opportunities at Paylocity, that Stratton did not like Jeremy, and that it was in Jeremy's best interests to take the Blue Marble role. Presented with no other options within Paylocity, Jeremy took the role. Jeremy had no exposure to Paylocity clients, client prospects, or client referral sources in the role.

56.     On or about November 16, 2021, Jeremy gave notice of his resignation to Paylocity President and Chief Operating Officer Michael Haske. Nonetheless, Paylocity asked Jeremy to continue providing services to Paylocity relative to the Blue Marble Payroll acquisition. Jeremy agreed to do so. Jeremy's last date of employment with Paylocity was December 10, 2021.

57.     Paylocity constructively discharged Jeremy as a result of its actions described in ¶¶ 51 - 56.

58.     At no time during Jeremy's employment with Paylocity was he ever assigned to, or responsible for, the entirety of the State of Florida. This is because Paylocity assigned Jeremy to a market segment and then by zip codes, not by states, cities, or counties.

59.     During Jeremy's employment with Paylocity, he traveled to and worked in the State of Illinois several times each year.  For example, beginning in 2018 he was involved in a market segment in certain zip codes in Illinois several weeks per he travelled to and worked for Paylocity in Illinois for various training, mentoring, and hiring classes, and leadership conferences and activities.

60.     During FY 2018, Jeremy worked for Paylocity in the State of Illinois approximately every two (2) months.

**The Paylocity Holding 2014 Plan and RSU Agreement**

61.      Pursuant to the 2014 Plan, Paylocity Holding has reserved shares of its common stock for issuance to its employees, directors and non-employee third parties. The 2014 Plan permits the granting of restricted stock units and other equity incentives at the discretion of the compensation committee of Paylocity Holding's board of directors (the "Committee"). (*See* Exhibit A) Each of Dan and Jeremy are party to the "Paylocity Holding Corporation Restricted Stock Units Agreement (For U.S. Participants)" (the "RSU Agreement"). (*See* Exhibit B)

62.     Section 14.7 of the RSU Agreement states that it "shall be governed by the laws of the State of Illinois." (Exhibit B)

63.     Each of Dan and Jeremy were awarded RSUs in Paylocity Holding.

64.     Each of Dan and Jeremy provided consideration for their receipt of RSU in Paylocity Holding in the form of work performed for Paylocity. The RSU Agreement admits as much, stating:

> **3.2     No Monetary Payment Required.**  The Participant is not required to make any monetary payment (other than applicable tax withholding, if any) as a condition to receiving the Units or shares of Stock issued upon settlement of the Units, **the consideration for which shall be past services actually rendered or future services to be rendered to a Participating Company or for its benefit**.

(Exhibit B, Section 3.2, emphasis added)

***The illegal Section 5.1 forfeiture provision in the RSU Agreement***

65.     The RSUs are wages under the laws of Illinois and under the laws of most states in which Paylocity employees reside and/or perform services on behalf of Paylocity.

66.     Section 5.1 of the RSU Agreement provides that a Participant forfeits his unvested RSUs if his Paylocity employment terminates for any reason and that he will receive no payment for the unvested RSUs. (Exhibit B)

67.     Section 5.1 of the RSU Agreement is unenforceable as a matter of law, and so are all others like it, because it disgorges wages earned by the Participant for work previously rendered to Paylocity:

> **5.1.     Grant of Company Reacquisition Right.**  Except to the extent otherwise provided by the Superseding Agreement, if any, in the event that the Participant's Service terminates for any reason or no reasons, with or without cause, the Participant shall forfeit and the Company shall automatically reacquire all Units which are not, as of the time of such termination, Vested Units (***"Unvested Units"***), and the Participant shall not be entitled to any payment therefor (the ***"Company Reacquisition Right"***).

68.     In fact, Dan and Jeremy and all other Participants are due and owing at least a *pro rata* portion of the RSUs they accumulated as part of their compensation package because they received the RSUs in return for work performed on behalf of Paylocity, as provided in Section 3.2 of the RSU Agreement.

69.     Paylocity Holding illegally deemed forfeited Dan's and Jeremy's unvested RSUs upon their termination of employment, pursuant to Section 5.1 of the RSU Agreement.

**RSU Agreement No. 2**

*The illegal Section 5.1 forfeiture provision in RSU Agreement No. 2*

70.     Like the RSU Agreement attached hereto as <u>Exhibit B</u>, RSU Agreement No. 2 also

states that each Participant provided consideration for their receipt of RSUs in Paylocity Holding

in the form of work rendered to Paylocity. Section 3.2 of RSU Agreement No. 2 states:

> **3.2     No Monetary Payment Required.**  The Participant is not required to make
> any monetary payment (other than applicable tax withholding, if any) as a condition
> to receiving the Units or shares of Stock issued upon settlement of the Units, **the**
> **consideration for which shall be past services actually rendered or future**
> **services to be rendered to a Participating Company or for its benefit**.

(<u>Exhibit C</u>, Section 3.2, emphasis added)

71.     Section 5.1 of RSU Agreement No. 2 has an identical forfeiture clause as found in

Section 5.1 of the RSU Agreement attached as <u>Exhibit B</u>.

72.     Section 5.1 of RSU Agreement No. 2 is unenforceable as a matter of law, and so

are all others like it, because it disgorges wages earned by the Participant for work previously

rendered to Paylocity.

73.     In fact, Dan and Jeremy and all other Participants are due and owing at least a *pro*

*rata* portion of the RSUs they accumulated as part of their compensation package because they

received the RSUs in return for work performed on behalf of Paylocity, as provided in Section 3.2

of the RSU Agreement.

*The illegal Section 7.5 repayment provision in RSU Agreement No. 2*

74.     Section 7.5 of RSU Agreement No. 2 requires a Participant to repay Paylocity

Holding the gross proceeds from all dispositions of RSUs granted to the Participant in the three

(3) years preceding any breach by the Participant of the covenant not to disclose confidential

information, the customer non-solicitation covenant, the employee non-solicitation and non-hire

covenants, or the covenant not to compete, all of which are set forth in Section 7 of RSU Agreement No. 2.

75.     Section 7.5 of RSU Agreement No. 2 is unenforceable as a matter of law, and so are all others like it, because, in violation of Illinois law, and the wage and hour laws of most states in which Paylocity employees live and/or perform work on behalf of Paylocity it disgorges wages earned by the Participant for services previously rendered to Paylocity, and because it is an unenforceable penalty clause:

> **7.5     Repayment.** In the event of any breach by the Participant of the provisions of this Section 7: (i) the Company shall have the right to require the Participant to deliver to the Company: (a) all Units granted to the Participant in the three (3) years preceding said breach; and (b) to the extent the Participant has disposed of any Units so granted or shares of Stock issue in settlement of such Units, the gross proceeds from all such dispositions; and (ii) any unvested Units shall be immediately forfeited (collectively, the "***Repayment Obligation***"). The determination of whether the Participant has engaged in a breach of Section 7 shall be determined by the Committee in its sole discretion. Any repayment obligations under this Section 7 shall be effected by the Participant within thirty (30) days of receipt of the Company's written demand for repayment. The Company may provide for an offset to any future payments owed by the Participating Company Group to the Participant, if necessary, to satisfy the Repayment Obligation. The Participant agrees to execute such documents as may be necessary to effect the repayment obligations referred to in this Section.  Nothing in this Section 7 shall limit any other remedies, including injunctive relief, available to the Participating Company Group under any other agreements or applicable law, nor shall anything in this Section 7 limit any other restrictions by with the Participant is bound under other agreements of applicable law.

76.     RSU Agreement No. 2's remedies for a Participant's breach of the covenants in Section 7 of the agreement are not limited to forfeiture and repayment. Rather, as stated in Section 7.5, Paylocity can seek to enforce the Section 7 covenants through, among other things, injunctive relief, and at the same time seek forfeiture and repayment.  Such agreements are void and unenforceable as a matter of public policy in that these agreements deprive the employee of his livelihood and deprive him of vested compensation that he has earned.  Johnson v. Country Life Ins. Co., 12 Ill.App.3d 158, 160 (1st Dist. 1973).

*The covenants themselves are unenforceable because they are overly broad and not reasonably necessary to protect a legitimate business interest of Paylocity*

77.      Section 7.2(a) of RSU Agreement No. 2, "Customer Non-Solicitation," is unenforceable as a matter of law, and so are all others like it, because for twenty-four (24) months post-termination of employment, it prohibits a Participant from "*accepting*" business from Paylocity "customers, brokers, brokerage firms, business partners, business associates, or end users" if the Participant "had direct or indirect contact" with the entity in the twelve (12) months prior to the Participant's termination, even if the entity chooses to come to the Participant unprompted and/or even if the entity was not within the Participant's assigned market segment and zip code. Meanwhile, the terms "customers, brokers, brokerage firms, business partners, business associates, or end users" are not defined at all, making the clause overly broad and unenforceable as a matter of law.  And, the term "Solicit" also is overly broad and unenforceable because it effectively bars a Participant from saying anything about Paylocity and violates the competitor's privilege.  To wit:  "Solicit shall mean (i) to make any comments or engage in and conduct that would influence a decision to continue doing business with Paylocity, regardless of how such comment or conducts are initiated."  This language, for example, would impermissibly prohibit Dan and Jeremy and any other Participant from lauding their commercial abilities through a website or via LinkedIn profiles.   It also would impermissibly prohibit Dan and Jeremy and any other Participant from stating positive things about Paylocity so as to influence the entity to consider doing business with Paylocity.

78.      Section 7.2(a) of RSU Agreement No. 2, "Customer Non-Solicitation," is unenforceable as a matter of law, and so are all others like it, because for twenty-four (24) months post-termination of employment, it prohibits a Participant from "accepting" or soliciting business from undefined entities simply because the Participant "had direct or indirect contact" with the

entity in the twelve (12) months prior to the Participant's termination, even if the contact was not as a result of conducting business on behalf of Paylocity and/or even if the entity was not within the Participant's assigned market segment and zip code.

79.     Section 7.2(a) of RSU Agreement No. 2, "Customer Non-Solicitation," is unenforceable as a matter of law, and so are all others like it, because for twenty-four (24) months post-termination of employment, it prohibits a Participant from "accepting" or soliciting business from undefined entities with whom Paylocity no longer transacts business, with undefined entities with whom Paylocity conducted no business, and/or with undefined entities not within the Participant's assigned market segment and zip code.

80.     Specifically, Section 7.2 of RSU Agreement No. 2 provides:

(a)     *Customer Non-Solicitation*. During employment with Paylocity and for a period of twenty-four (24) months following the termination of employment for any reason, the Participant agrees not to directly or indirectly contact, Solicit (defined below) or accept business from any of Paylocity's customers prospective customers, brokers, brokerage firms, business partners, business associates, or end users, with whom the Participant had direct or indirect contact or solicited on behalf of Paylocity in the twelve (12) months prior to the Participant's termination, for the purpose of selling or soliciting products or services that are in competition with the products or services of Paylocity.

81.     Section 7.3 of RSU Agreement No. 2, "Covenant Not To Compete," is unenforceable as a matter of law, and so are all others like it, because for twelve (12) months post-termination of employment, it prohibits a Participant from "own[ing] any business *** that sells Competing Products in the Restricted Territory" without considering whether the Participant is selling the product to the same market segment to which Paylocity assigned the Participant in the twenty-four (24) months preceding the Participant's termination of employment.

82.     Section 7.3 of RSU Agreement No. 2, "Covenant Not To Compete," is unenforceable as a matter of law, and so are all others like it, because for twelve (12) months post-

termination of employment, it prohibits a Participant from "work[ing] in the Restricted Territory for any person or entity that sells Competing Products" without considering whether the Participant is selling the product to the same market segment to which Paylocity assigned the Participant in the twenty-four (24) months preceding the Participant's termination of employment.

83.     Specifically, Section 7.3 of RSU Agreement No. 2 provides:

**7.3     Covenant Not to Compete.** During employment with Paylocity and for a period of twelve (12) months following termination of employment for any reason, the Participant agrees not to directly or indirectly, on behalf of Participant or in conjunction with any other person or entity: (i) own any business (other than less than 3% ownership in a publicly traded company) that sells Competing Products in the Restricted Territory; or (ii) work in the Restricted Territory  for any person or entity that sells Competing Products, in any role: (y) that is similar to any position that I held with the Company during the twenty-four (24) months preceding the termination of the Participant's employment, or (z) that may cause the Participant to inevitably rely upon or disclose Paylocity's Confidential Information.  The term "***Competing Products***" shall mean products or services sold by Paylocity, or any prospective product or service Paylocity took steps to develop, and for which the Participant had any responsibility during the twenty-four (24) months preceding the termination of the Participant's employment, including without limitation, any products or services related to software solutions for payroll, human capital management, human resources, benefits, time and labor, and talent management. The term "***Restricted Territory***" shall mean the geographic territory over which the Participant had responsibility during the twenty-four (24) months preceding the termination of the Participant's employment.

84.     Section 7.3 of RSU Agreement No. 2, "Covenant Not To Compete," is unenforceable as a matter of law, and so are all others like it, because for eternity and with no geographic limitation, it impermissibly prohibits the Participant from competing if, by doing so, the Participant would "inevitably rely upon or disclose Paylocity's Confidential Information." Section 7.1 of RSU Agreement requires a Participant to keep Paylocity's "Confidential Information" confidential for eternity anywhere in the world.   Meanwhile, the Section 7.1(a) definition of "Confidential Information" includes the broad, catch-all language "belonging to, or other otherwise relating to the business of Paylocity."

85.    As written, Section 7.1(a) covers virtually every fact, plan, name, proposal, and data" that a Participant became aware of during Paylocity employment – without regard as to whether the information was in any way proprietary or confidential in nature.  Such clauses have been found unenforceable as a matter of law. Assured Partners, Inc. v. Schmitt, 2015 IL App (1st) 141863, ¶ 46; Carlson Grp., Inc. v. Davenport,  2016 WL 7212522, at **11-13 (N.D. Ill. Dec. 13, 2016).

86.    Read together, the Section 7.1 Covenant Not to Disclose and the Section 7.3 Covenant Not To Compete constitute an unenforceable non-competition covenant of indefinite duration and unlimited geography.  Section 7.1(a)'s "generally known to the relevant public" carve-out does not make the covenants reasonable.

87.    There is a great deal of Paylocity information that is not generally known to the public; not all of it merits protection under Paylocity's confidentiality provision.

88.    Prior to his separation from Paylocity, Jeremy asked Paylocity Sr. Director of Talent Management & HR Kate Grimaldi for clarity regarding the breadth of the non-competition covenant.  In a December 16, 2021 e-mail, Grimaldi responded "[a]pologies for the delay on reviewing your agreements.  Based on your signed agreements, you would be permitted to work for a competitor that is outside the Restricted Territory – which could include geographies that [he] did not have responsibility for at Paylocity during the last 24 months."  A copy of the December 16, 2021 e-mail is attached hereto and made a part hereof as **Exhibit D**.

89.    After December 16, 2021, Jeremy attended an exit interview with Paylocity.  He told Paylocity that he did not know what he was going to do after leaving Paylocity.  Jeremy did not know what he was going to do after leaving Paylocity, though he was considering possibly going into the insurance business, selling real estate, or perhaps the payroll services industry.

19

Dan and Jeremy begin operating Clarity HCM, LLC in limited parts of the United States

90.     After leaving their employment with Paylocity, Dan and Jeremy began operating Clarity HCM, LLC ("Clarity") in Santa Rosa Beach, Florida, Jeremy's city of residence. Santa Rosa Beach is located in a region known as the Florida Panhandle. Clarity launched its website in or about May 2022. Dan's and Jeremy's affiliation with Clarity first appeared on their LinkedIn pages in or about May 2022.

91.     Clarity does not operate nationwide.

92.     Clarity is a retail provider of certain cloud-based software services commonly referred to a "human capital management services" or "HCM." Clarity has a business relationship with isolved Network, LLC ("isolved"), a developer of an HCM platform. Clarity's business relationship with isolved allows Clarity to offer the isolved HCM platform to Clarity's clients.

93.     Clarity is not a franchisee or partner of isolved and Clarity is not owned by isolved.

94.     Neither Jeremy nor Dan are isolved employees.

95.     As is clearly shown on Clarity's website, Clarity's business model is that of a selective, boutique firm. The nature of Clarity's business practice requires it to maintain a low client count and to focus on developing strong client relationships. Clarity focuses its efforts on a select group of key partners, unaffiliated with Paylocity, and outside of the Restricted Territories described in RSU Agreement No. 2.

96.     Santa Rosa Beach, Florida is not a Restricted Territory under RSU Agreement No. 2 as the agreement relates to Dan.

97.     Santa Rosa Beach, Florida is not a Restricted Territory under RSU Agreement No. 2 as the agreement relates to Jeremy.

98.     Dan and Jeremy do not engage in any operations, sales, or solicitations, whether through Clarity or otherwise, in any Restricted Territories under RSU Agreement No. 2.

99.     Dan and Jeremy do not solicit Paylocity business referral partners, whether through Clarity or otherwise, in any Restricted Territories under RSU Agreement No. 2.

**The Defendants' bad faith campaign to squelch lawful competition**

100.     Nonetheless, and with Defendants' knowledge that neither Dan nor Jeremy were violating the restrictive covenants in Section 7 of RSU Agreement No. 2, Defendants began an aggressive campaign to interfere with the Plaintiffs' legitimate business operations, demanded that Dan and Jeremy repay the proceeds of their dispositions of Restricted Stock Units pursuant to Section 7.5 of RSU Agreement No. 2, threatened Dan, Jeremy, and Clarity with a complaint seeking to enjoin them from engaging in legitimate competitive activities, and tortuously interfered with Dan's and Jeremy's prospective business relationships..

101.     After the Defendants filed their Motion to Dismiss the Complaint, Paylocity Holding filed a Verified Complaint for Injunctive Relief and Damages in the U.S. District Court for the Northern District of Illinois, Eastern Division, Case No. 1:22-cv-05236. (Dkt. # 1) The case is assigned to the Honorable John J. Tharp, Jr.

102.     By letter dated June 10, 2022, Defendants' counsel accused Jeremy of breaching the covenant not to compete in Section 7.3 of RSU Agreement No. 2 because Clarity "apparently is a franchise of iSolve (sic)" and because "as Regional Vice President of Sales, you had responsibilities for *** Florida.  Therefore, opening and running a competing business out of Florida clearly is a breach [of Section 7.3 of RSU Agreement No. 2]."  A copy of the June 10, 2022 letter to Jeremy is attached hereto and made part hereof as **Exhibit E**. The letter threatened Jeremy with a suit for injunctive relief to prevent further breaches of RSU Agreement No. 2 and

seeking repayment of $822,000.00 in proceeds from RSUs in Paylocity Holding that Jeremy cashed out in the last three (3) years.

103.    Regarding Jeremy, Defendants claimed that he had responsibilities for the entire State of Florida, and, as a result, his operation of a business *anywhere* in the State Florida is a breach of Jeremy's covenant not to compete.  (Exhibit E)

104.    Jeremy's assigned territories did not consist of entire states.  Rather, his assigned territories were defined by market segment and then by zip code, not generalized regions.

105.    Jeremy never was assigned to manage any territory in the Florida Panhandle.

106.    At all relevant times, Defendants knew that Jeremy's assigned territories did not include the entire State of Florida and did not include the Florida Panhandle.

107.    This fact is evidenced, and can be confirmed, by, among other things, April 7, 2021 email correspondence from Paylocity's Assistant Vice President of Sales, Chris Stratton, a copy of which is attached hereto and made a part hereof as **Exhibit F**.  Per the April 7, 2021 correspondence, Mr. Stratton outlines on a color-coordinated map the specific portions of the State of Florida over which Jeremy maintained responsibility.  Likewise, the map depicts those specific portions of the State of Florida for which Jeremy had *no* responsibility, including the part of the state known as the Florida Panhandle.

108.    Further, Defendants are in possession and control of additional information establishing that Jeremy was never assigned to, or managed, the Florida Panhandle, including, without limitation: (a) Jeremy's FY 2020 Quota report; (b) Jeremy's FY2020 sales staffing report; (c) the territory reports of sales representatives; and (d) the South Region Contact List.

109.    By letter dated June 10, 2022, Defendants' counsel accused Dan of breaching the covenant not to compete in Section 7.3 of RSU Agreement No. 2.  A copy of the June 10, 2022

letter to Dan is attached hereto and made part hereof as **Exhibit G**. The letter threatened Dan with a suit for injunctive relief to prevent further breaches of RSU Agreement No, 2 and seeking repayment of $797,000.00 in proceeds from RSUs in Paylocity Holding that Dan cashed out in the last three (3) years.

110.    Regarding Dan, Defendants claimed that, as a Senior HCM Account Executive, his "designated territory was greater Tampa, Florida" and that "opening and running Clarity out of this area" is a breach of Section 7.3 of RSU Agreement No. 2.  (Exhibit G)

111.    As with Jeremy, Dan's assigned territories were assigned by market segment and zip code, and were not generalized regions.

112.    Dan never was assigned to, or responsible for, the entirety of Tampa, Florida or the "greater Tampa, Florida" area.

113.    At all relevant times, Defendants knew that Dan never was assigned to, or responsible for, the entirety of Tampa, Florida or the "greater Tampa, Florida" area.

114.    At all relevant times, Defendants knew that Dan never was assigned to, or responsible for, the entirety of Tampa, Florida or the "greater Tampa, Florida" area because this fact is reflected in Defendants' territory maps, Dan's quota reports, sales staffing reports, territory reports, and contact lists.

115.    Through a June 17, 2022 letter from Plaintiffs' attorneys, Plaintiffs affirmed to Defendants' counsel that neither Dan nor Jeremy, whether through Clarity or otherwise, had engaged in any operations, sales, or solicitations in any of Dan's or Jeremy's respective previously assigned territories with Paylocity. A copy of the June 17, 2022 letter is attached hereto and made a part hereof as **Exhibit H**.

116.    Plaintiffs took further reasonable measures to ensure that they were not crossing into or engaging in operations in any of Dan's or Jeremy's assigned territories over the twenty-four (24) months preceding Dan's or Jeremy's respective terminations of employment with Paylocity.  By letter to Paylocity counsel of June 17, 2022, Plaintiffs asked that Defendants provide Plaintiffs with a complete listing of all specific territory assignments, broken down by zip code and end date of assignment over the relevant 24-month period.  (Exhibit H)

117.    Defendants rejected Dan's and Jeremy's request for a complete listing of all specific territory assignments, broken down by zip code and end date of assignment over the relevant 24-month period.

118.    Through a June 29, 2022 letter from Plaintiffs' attorneys, Plaintiffs reaffirmed their adherence to the non-competition provision in RSU Agreement No. 2, and again directed Defendants to their own records showing that neither Dan nor Jeremy were operating in restricted territory.  A copy of the June 29, 2022 letter is attached hereto and made a part hereof as **Exhibit I**.

119.    The June 29, 2022 letter also affirmed that Dan and Jeremy had not engaged in any improper solicitations, and that, in fact, they actually had passed potential leads on to Paylocity since leaving Paylocity.

120.    Defendants have not provided Dan or Jeremy with a complete listing of either Dan's or Jeremy's specific territory assignments, broken down by market segment or by zip code or by end date of assignment over the twenty-four (24) months preceding their respective terminations of employment with Paylocity, despite their requests for the same.

121.    Further, Defendants never have made specific allegations as to any operations that Dan or Jeremy have engaged in, whether on their own behalf or that of Clarity, in any of the actual territories they either were responsible for or managed during their tenure with Paylocity.

122.    Thus, Plaintiffs provided Defendants with facts showing that neither Dan nor Jeremy were in breach of Section 7.3 of RSU Agreement No. 2.

123.    Thus, Defendants provided Plaintiffs with no facts that Dan or Jeremy on were in breach of Section 7.3 of RSU Agreement No. 2.

124.    Nevertheless, on July 1, 2022, in violation of their duty of good faith and fair dealing, Paylocity Holding, on its behalf, on Paylocity's behalf, and with Paylocity's aiding and abetting, announced to each of Dan and Jeremy that "Paylocity has determined, in its sole discretion" that they breached RSU Agreement No. 2 for the reasons detailed in Paylocity counsel's June 10, 2022 letters to Dan and Jeremy.

125.    Specifically, by letter of July 1, 2022, Paylocity Holding demanded that Jeremy repay the Gross proceeds he received from his disposition of RSUs during the last three (3) years prior to his alleged breach of Section 5 of RSU Agreement No. 2. A copy of the July 1, 2022 letter is attached hereto and made a part hereof as **Exhibit J**. The letter demands repayment of $821,860.11 by July 31, 2022. (*Id.*)  Paylocity Holding's demand letter did not provide Jeremy with an accounting or vesting schedules concerning these dispositions or any proof that he received this amount in disposition proceeds.  And, in addition to Paylocity Holding's bad faith exercise of its Section 7.5 "repayment" discretion, Paylocity Holding wrongfully demanded that Jeremy pay the "gross" amount of disposition proceeds even though he paid taxes on the disposition proceeds.

126.    Specifically, by letter of July 1, 2022, Paylocity Holding demanded that Dan repay the gross proceeds he received from his disposition of RSUs during the last three (3) years prior to

his alleged breach of Section 5 of the RSU Agreement. A copy of the July 1, 2022 letter is attached hereto and made a part hereof as **Exhibit K**. The letter demands repayment of $796,626.03 by July 31, 2022. (*Id.*) Paylocity Holding's demand letter did not provide Dan with an accounting or vesting schedules concerning these dispositions or any proof that he received this amount in disposition proceeds. And, in addition to Paylocity Holding's bad faith exercise of its Section 7.5 "repayment" discretion, Paylocity Holding wrongfully demanded that Jeremy pay the "gross" amount of disposition proceeds even though he paid taxes on the disposition proceeds.

127. Defendants persisted in their interference with Clarity's business relationship with isolved even after isolved explained to Paylocity that Clarity merely has a business relationship with isolved to use its HCM platform, that Clarity is not a franchise of isolved, that isolved does not control Plaintiffs, and that neither Dan nor Jeremy are employees of isolved.

128. Before and after Dan's and Jeremy's termination of employment, some Paylocity employees who signed identical or substantially similar customer non-solicitation covenants and non-competition agreements have become employed by direct competitors of Paylocity, in "violation" of those covenants. Yet, the Defendants have not filed lawsuits against those employees or pursued repayment of RSU disposition proceeds from those employees.

129. Upon information and belief, Dan's and Jeremy's experiences as described above are typical and representative of the experiences of the putative RSU Class.

130. Upon information and belief, at all relevant times, over one-hundred (100) Paylocity employees either resided in Illinois, and/or have worked in Illinois on behalf of Paylocity.

131.    Dan, Jeremy, and the putative RSU Class have continuously and repeatedly been exposed to risks and harmful conditions through Defendants' violations of the Illinois Act and the unenforceable penalty clause as described herein.

132.    Dan, Jeremy, and the putative RSU Class have continuously and repeatedly been exposed to risks, harmful conditions, and wrongful conduct by the Defendants through the unenforceable confidentiality, customer non-solicitation, and non-competition covenants in RSU Agreement No. 2.

## CLASS ALLEGATIONS – PUTATIVE RSU CLASS

133.    Upon information and belief, the practices, policies, and consequences pertinent to Defendants RSU Agreement and/or RSU Agreement No. 2 as described above apply or applied to each putative RSU Class member.

134.    Upon information and belief, at least 500 Paylocity employees are governed by the RSU Agreement or RSU Agreement No. 2, and such agreements contain an Illinois governing law provision.

135.    **Class Definition:** Dan and Jeremy bring this action pursuant to 735 ILCS 5/2-801 on behalf of themselves and an RSU Class of similarly situated individuals, defined as follows:

> All current or former employees of Paylocity who are bound by the RSU Agreement or the RSU No. 2 Agreement whether or not they forfeited unvested Restricted Stock Units due to termination of employment, whether or not they were required to deliver to Paylocity Holding all Units granted to the Participant in the three (3) years preceding a breach of a covenant not to disclose, or a covenant not to compete, or a covenant not to solicit or hire, or whether or not they were required to repay the gross proceeds from all disposition of any Units granted or Shares of Stock issue in settlement of such Units, or whether or not they were required to immediately forfeit unvested Units, over the past ten (10) years.

136.    Dan and Jeremy anticipate that, as a result of discovery related to the states in which Paylocity employees live and where they perform work on behalf of Paylocity, the Class may be

further refined by sub-classes or otherwise to account for the wage claim aspect of the Class Action.

137.    **Numerosity:** The exact number of RSU Class members is unknown to Dan and Jeremy at this time, but upon observation, information and belief, it is at least 500 individuals. Individual joinder is impracticable. Ultimately, the RSU Class members will be easily identified through Defendants' employment and benefit records.

138.    **Commonality and Predominance:** There are many questions of law and fact common to the claims of Dan, Jeremy, and the RSU Class, and those questions predominate over any questions that may affect individual members of the RSU Class. Common questions for the RSU Class include, but are not necessarily limited to the following:

(a)     Whether the RSU Agreement forfeiture clause violates the Illinois Wage Act, and the wage laws of other jurisdictions in which the RSU Class live and/other perform work on behalf of Paylocity;

(b)     Whether the RSU Agreement No. 2 forfeiture clause violates the Illinois Wage Act, and the wage laws of other jurisdictions in which the RSU Class live and/other perform work on behalf of Paylocity;

(c)     Whether the RSU Agreement No. 2 repayment clause violates the Illinois Wage Act, and the wage laws of other jurisdictions in which the RSU Class live and/other perform work on behalf of Paylocity;

(d)     Whether the RSU Agreement No. 2 repayment clause is an unenforceable penalty clause;

(e)     Whether the Customer Non-Solicitation covenant is unenforceable; and

(f)     Whether the Covenant Not To Compete is unenforceable.

139.    **Adequate Representation:** Dan and Jeremy will fairly and adequately represent and protect the interests of the RSU Class and have retained counsel competent and experienced in complex litigation and class actions. Dan and/or Jeremy have no

28

interests antagonistic to those of the RSU Class, and the Defendants have no defenses unique to Dan and/or Jeremy. Dan and Jeremy and their counsel are committed to vigorously prosecuting Dan's and/or Jeremy's action on behalf of the members of the RSU Class and have the financial resources to do so. Neither Dan, nor Jeremy, nor their counsel has any interest adverse to those of the other members of the RSU Class.

140. **Appropriateness:** This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The damages suffered by the individual members of the Class are likely to have been small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' wrongful conduct. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

**Count I – Declaratory Judgment**
**Dan and Jeremy and all others similarly situated v. Paylocity Holding and Paylocity**

141. Plaintiffs incorporate and reallege herein ¶¶ 1 through 140 above.

Section 3.2 of the RSU Agreement and RSU Agreement No. 2 each violate the Illinois Act

142.     Dan's unvested RSUs are wages governed by the Illinois Wage Payment and Collection Act ("Illinois Act"), as reflected by the plain language of Section 3.2 of the RSU Agreement and Section 3.2 of RSU Agreement No. 2.

143.     Jeremy's unvested RSUs are wages governed by the Illinois Act, as reflected by the plain language of Section 3.2 of the RSU Agreement and Section 3.2 of RSU Agreement No 2.

144.     The Illinois Act, 820 ILCS 115/2, defines wages as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the two parties, whether the amount is determined on a time, task, piece, or any other basis of calculation. The RSU Agreement and RSU Agreement No. 2 are employment contracts or agreements under Section 2 of the Illinois Act.

145.     The Illinois Act, 820 ILCS 115/5, provides that every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee.

146.     The Illinois Act, 820 ILCS 115/9, states that, "[e]xcept as hereinafter provided, deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the time the deduction is made ***."

147.     The forfeiture clauses in Section 3.5 of the RSU Agreement and in Section 3.5 of RSU Agreement No. 2 are not required by law, are not to the benefit of the employee, are not in response to a valid wage assignment or wage deduction order, and are not made with the express written consent of the employee, given freely at the time the deduction is made. Therefore, the Section 3.2 forfeiture clauses are illegal disgorgements or clawbacks of earned wages under the

Illinois Act.

Section 7.5 (i), (ii), and (iii) of RSU Agreement No. 2 violate the Illinois Act

148.     The repayment clause in Section 7.5(i), (ii), and (iii) of RSU Agreement No. 2 likewise contains a forfeiture clause. Section 7.5(ii) of RSU Agreement No. 2 is an illegal disgorgement or clawback of earned wages for the same reasons as the Section 3.2 forfeiture clauses are illegal disgorgements or clawbacks of earned wages under the Illinois Act.

Section 7.5 (i), (ii), and (iii) of RSU Agreement No. 2 are unenforceable penalty clauses

149.     The forfeiture and repayment clauses in Section 7.5(i), (ii), and (iii) of RSU Agreement No. 2 also are unenforceable because they are illegal penalty clauses having no rational relationship to the damages caused or allegedly caused by the Participants breach of a covenant found in Section 7 of RSU Agreement No. 2, and because the actual damages for Dan's or Jeremy's breach of their non-competition clauses would be certain in amount and not difficult to prove.

150.     In any breach of contract case, the proper measure of damages is the amount that will place the non-breaching party in as satisfactory a position as it would have been had the contract been fully performed.

151.     Damages in a breach of non-competition covenant case are lost profits. The approximately $800,000.00 repayment Paylocity Holding seeks from each of Dan and Jeremy bears no rational relationship to Paylocity's potential or alleged lost profits as a result of Dan's or Jeremy's breach or alleged breach of their non-competition covenants or customer non-solicitation covenants.

Section 7.1 (a), Section 7.2(a) and Section 7.3 of RSU Agreement No. 2 are unenforceable as a matter of law

152.     Dan, Jeremy, and the putative RSU Class have continuously and repeatedly been exposed to risks, harmful conditions, and wrongful conduct by the Defendants through the

31

unenforceable confidentiality, customer non-solicitation, and non-competition covenants in RSU Agreement No. 2.

WHEREFORE, Daniel Bova and Jeremy Harris, and all others similarly situated, respectfully request that this Honorable Court enter judgment on their behalf and against each Defendant:

(a) declaring that the forfeiture clause in the RSU Agreement is unenforceable as a matter because it violates the Illinois Act;

(b) declaring that the forfeiture clause in RSU Agreement No. 2 is unenforceable as a matter because it violates the Illinois Wage Payment and Collection Act;

(c) declaring that the repayment provisions in RSU Agreement No. 2 are unenforceable as a matter of law because they violate the Illinois Act;

(d) declaring that repayment provisions in RSU Agreement No. 2 are unenforceable as a matter of law because they are illegal penalty clauses;

(e) declaring that the customer non-solicitation covenant in RSU Agreement No. 2 is unenforceable as a matter of law;

(f) declaring that the non-competition covenant in RSU Agreement No. 2 is unenforceable as a matter of law;

(g) declaring that the confidentiality clause in RSU Agreement No. 2 is unenforceable as a matter of law;

(h) requiring Defendants to cease the unlawful activities discussed herein;

(i) awarding damages to Dan Bova, Jeremy Harris, and the putative RSU Class;

(j) awarding Dan Bova, Jeremy Harris, and the putative RSU Class reasonable attorneys' fees and costs; and

(k) awarding such other relief as the Court deems proper.

**Count II – Breach of Contract**
**Dan and Jeremy v. Paylocity Holding**
**Jury Trial Demanded**

153.    Dan and Jeremy incorporate and reallege herein ¶¶ 1 through 152 above.

154.    Dan and Jeremy each have performed their obligations under the RSU Agreement and RSU Agreement No. 2.

155.    The covenant of good faith and fair dealing guides the construction of explicit terms in an agreement.

156.    The covenant of good faith and fair dealing limits Paylocity Holding's exercise of discretion vested in it by RSU Agreement No. 2.

157.    Paylocity Holding exercised the discretion vested in it under Section 7.5 "Repayment," unreasonably and without proper motive, arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

158.    Paylocity Holding breached its duty of good faith and fair dealing in demanding that Dan and Jeremy forfeit the RSUs or repay proceeds from the dispositions of the RSUs.

WHEREFORE, Daniel Bova and Jeremy Harris, respectfully request that this Honorable Court enter judgment on their behalf and against Paylocity Holding:

(a) declaring that Paylocity Holding breached RSU Agreement No. 2;

(b) declaring that Paylocity Holding's demand for forfeiture and/or repayment is of no effect;

(c) requiring Paylocity Holding to cease the unlawful activities discussed herein;

(d) awarding damages to Dan and Jeremy;

(e) awarding Dan and Jeremy reasonable attorneys' fees and costs; and

(f) awarding such other relief as the Court deems proper.

Dated:  January 5, 2023                          Respectfully submitted,

                                                 DANIEL BOVA and JEREMY HARRIS,
                                                 and all others similarly situated

                                                 By: */s/ Margherita M. Albarello*
                                                         One of their attorneys


Margherita M. Albarello, Esq. (#6187375)
Brittany N. Bermudez, Esq. (#6317591)
GOLAN CHRISTIE TAGLIA LLP
70 W. Madison, Suite 1500
Chicago, Illinois 60602
(T): 312-263-2300
mmalbarello@gct.law
bnbermudez@gct.law

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, a non-attorney, hereby certifies that they caused a copy of the foregoing **Amended Complaint – Class Action** to be served upon the following:

Debbie L. Berman
Peter J. Brennan
Katherine M. Funderburg
Hope H. Tone-O'Keefe
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350
DBerman@jenner.com
PBrennan@jenner.com
KFunderburg@jenner.com
HToneOKeefe@jenner.com

by causing a copy of same to be filed via CM/ECF, this 5th day of January, 2023.

By: *    /s/ Caileen Connolly    *